**Opinion issued May 16, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-22-00313-CV**

———————————

**TEAM INDUSTRIAL SERVICES, INC., Appellant**

**V.**

**KELLI MOST, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JESSE HENSON, Appellee**

---

**On Appeal from the 268th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 18-DCV-256883**

---

## O P I N I O N

Appellant, Team Industrial Services, Inc. ("Team"), challenges the trial court's judgment, entered after a jury trial, in favor of appellee, Kelli Most, individually and as personal representative of the estate of Jesse Henson, deceased,

in her wrongful death and survival suit against Team.[1]  In five issues, Team contends that the trial court erred in denying its motion to dismiss for forum non conveniens, refusing to apply Kansas law to its claims, and entering a grossly excessive damages award that resulted from errors in selecting and instructing the jury and allowing improper argument.

We vacate and dismiss.

### Background

In her third amended petition, Most, the widow of Henson, alleged that on or about June 4, 2018, Henson, who was employed at the Jeffrey Energy Center, a coal-fired power plant in Kansas owned by Westar Energy ("Westar"), a Kansas utility company, "was exposed to a steam release" when a pressure relief valve failed.  Henson "suffered severe burns," which "ultimately led to him suffering a horrific death."  Henson's death occurred shortly after Team, an industrial services provider, had serviced the Jeffrey Energy Center's pressure relief valves under a contract with Westar.

Most brought wrongful death and survival claims against Team, asserting that Team "was negligent, negligent per se, and grossly negligent" because it failed to adequately train, instruct, and supervise its employees; "have adequate safety policies and procedures"; properly maintain, inspect, and operate "the equipment";

---

[1]  *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 71.001–.012, 71.021–.022.

2

"provide adequate equipment"; "properly perform the work in question"; "ensure that [its] worksite was reasonably safe"; adequately maintain and inspect "the premises at issue"; and "remedy" or "adequately warn of a dangerous and/or hazardous condition." According to Most, Team also "creat[ed] a dangerous and/or hazardous condition" and Team was "vicariously liab[le] for the conduct of [its] employees." Most additionally alleged that Team had "violat[ed] applicable government regulations, laws, rules, and industry standards" and committed "[o]ther acts deemed negligent, negligent per se, and grossly negligent."

Further, "[a]s a direct and proximate result of Team's [negligent] conduct," Most alleged, Henson had "sustained severe physical pain, disfigurement, fear, mental anguish, and emotional distress" and she had "lost her husband." Specifically, the damages that she and Henson "sustained in the past" and that she would "continue to sustain in the future" included Henson's "[p]re death physical pain and physical pain and suffering," their "mental pain," and their "suffering, emotional distress, and mental anguish." Most also alleged damages including the "[l]oss of earning capacity and inheritance," "fringe benefits," "services and support," "nurture, guidance, care, and instruction," "enjoyment of life," "future pecuniary support," "society and companionship," and "[a]ll other damages recoverable under the law."

Additionally, Most alleged that she was "entitled to punitive damages because [Team] willfully and wantonly disregarded" the "safety and rights" of Henson and Most by "act[ing] with flagrant and malicious disregard of [Henson's] health and safety." According to Most, Team was "subjectively aware of the extreme risk posed by the conditions which caused [Henson's] death, but [it] did nothing to rectify them" despite "knowing that the conditions posed dangerous and grave safety concerns." Most alleged that Team's "acts and omissions involved an extreme degree of risk considering the probability and magnitude of potential harm to [Henson] and others" and Team "had actual, subjective awareness of the risk, and consciously disregarded" it.[2]

As to jurisdiction and venue, Most alleged that Team was a Texas citizen and its principal place of business was in Texas. According to Most, venue was proper in Fort Bend County, Texas under Texas Civil Practice and Remedies Code section 15.002.

---

[2]    In addition to the claims against Team, Most previously, in her second amended petition, brought products liability claims against Emerson Process Management Valve Automation, Inc., Emerson Process Management, LLP, Emerson Process Management Regulator Technologies, Inc., and Emerson Electric Co. (collectively, the "Emerson entities"), and Siemens Corporation ("Siemens"). Most asserted that Emerson was a Texas citizen with its principal place of business in Texas, and Siemens was a foreign corporation with its corporate headquarters in Harris County, Texas. Most nonsuited her claims against the Emerson entities and Siemens before trial.

In its first amended answer, Team generally denied the allegations in Most's petition. Team also raised various affirmative defenses, including that "[t]he accident at issue and injuries in question" occurred as a result of "independent, intervening, or superseding causes" and "were caused wholly or in part by the negligence or fault of others," such as Westar, and Team was entitled to "an allocation of fault and determination of the proportionate share of fault."

Team further pleaded for any recovery by Most to be "reduced or barred" under applicable law, including Texas Civil Practice and Remedies Code chapter 71 and Kansas Statutes chapter 60, article 19, in particular "the limitations on nonpecuniary losses set forth in [Kansas Statutes] section 60-1903." Additionally, according to Team, any recovery of compensatory damages by Most was "limited pursuant to any applicable statutory and common law restrictions, . . . including [Kansas Statutes] section 60-19a02." And Team requested a jury trial.

Team then sought dismissal of Most's claims against it based on forum non conveniens. In its motion to dismiss for forum non conveniens, Team pointed out that Most was a Kansas resident, Henson "resided, worked, and died in Kansas," and the accident in which Henson was fatally injured occurred at the Jeffrey Energy

5

Center in Kansas.[3] Team asserted that Most's claims could be tried in Kansas and Kansas law provided an adequate remedy for Most's claims.

As to the private interest factors to be considered in a forum non conveniens determination, Team observed that "most of the evidence and documents" relevant to Most's claims as well as "most of the non-party witnesses" were located in Kansas. Although a Kansas court could compel the Kansas non-party witnesses to appear for depositions and at trial, a Texas court could not. Team also noted that the estate of Henson's coworker, Damien Burchett, who had suffered fatal injuries in the same accident, had "already filed a wrongful death lawsuit in Kansas," and Team anticipated that certain insurance litigation involving the accident would be filed in Kansas.

As to the public interest factors relevant to the forum non conveniens determination, Team argued that Most's claims against it "ha[d] no significant connection to Texas" because Henson had lived and worked in Kansas, and he died from an accident that occurred in Kansas. And Most was a Kansas resident. According to Team, it would be "fundamentally unfair to burden the people of Texas with the cost of providing courts to hear" Most's claims, which had "no significant connection" to Texas.

---

[3] Specifically, Team asserted that the injury-causing accident occurred when "discharge piping at the Jeffrey Energy Center became unbolted from the pressure relief valve, allowing a large steam release."

In her response to Team's motion to dismiss, Most maintained that it would not be "inconvenient for [Team] to litigate th[e] case" in Texas, its "home state." Most stated that eight "key witnesses already identified" by the Emerson entities[4] in their discovery responses "[we]re located in Fort Bend County" or Montgomery County, Texas and no party had identified any "Kansas witnesses [w]hose testimony w[ould] be needed."

Further, according to Most, Team could not "credibly claim [it] w[ould] suffer substantial prejudice" from having to litigate in Texas. Because Team maintained corporate offices in Texas, Most argued that it was "likely that most of the documents [we]re located at the[] offices in Texas." She also noted that Team had not provided any "evidence that any of the[] relevant documents [we]re located in Kansas."

Additionally, Most asserted that it was likely that the "witnesses who w[ould] need to testify at trial" were located in Texas. And she noted that Team had not yet responded to her "discovery requests" that sought information about where Team's witnesses resided. Most also pointed out that the Emerson entities had "transported the equipment" that had failed from the Jeffrey Energy Center in Kansas to Fort Bend County "to have it inspected and/or tested." According to Most, "[t]he important witnesses in [her suit] w[ould] be" the Team employees who had been

---

[4] At the time Most filed her response, she had not yet nonsuited the Emerson entities.

7

"temporarily in Kansas" to "install[] the equipment" and the Team employees who had "planned out the job," and they were likely Texas residents.[5]

As to the public interest factors relevant to the forum non conveniens determination, Most asserted that the equipment and work plans likely occurred in Texas and Texas citizens had "an interest in judging the conduct of companies that reside[d] [in Texas], d[id] a substantial amount of business [in Texas], and whose conduct in Texas resulted in the death of others."

At the hearing on the motion to dismiss for forum non conveniens, Team explained that while it had corporate offices in Sugar Land, Texas, its office in Broken Arrow, Oklahoma had handled the pressure relief valve maintenance for the Jeffrey Energy Center. And evidence presented at the hearing showed that only one Team employee, who allegedly "had some involvement" with the maintenance performed on the Jeffrey Energy Center's pressure relief valves immediately preceding the accident, was within the trial court's subpoena power. The two Team technicians who had been sent to Kansas to perform the pressure relief valve maintenance at the Jeffrey Energy Center, Gary Gautney and Brad Whinery, were "somewhere" in the Tulsa, Oklahoma area, and the majority of Team's documents related to Most's claims were located at Team's Broken Arrow office. At the

---

[5] Most also asserted that her witnesses would include employees of the Emerson entities who had "inspected the equipment" after the accident and they were Texas residents.

hearing, Team provided an exhibit of the plaintiff's initial disclosures in the Kansas suit brought by the estate of Burchett, which had identified as potential witnesses four Westar employees who were Kansas residents.

Following the hearing, the trial court denied Team's motion to dismiss for forum non conveniens.

At trial,[6] Gautney, a former employee of Team, testified that he was a "valve tech" inspector and was a lead supervisor at Team around the time of the accident. Team was a "VR company," which meant that it had certifications from the National Board of Boiler and Pressure Vessel Inspectors and was allowed to certify a repair if a valve passed a code inspection. Gautney himself did not have a specific certification to work on relief valves that were manufactured by a company named Crosby, but he was certified to work on other valves and was qualified through his training to work on them.

Gautney further testified that in April 2018, he and Whinery spent about ten days at the Jeffrey Energy Center during a plant shutdown to perform a "code repair" of the pressure relief valves for Westar. The scope of work for Gautney and Whinery was limited to the pressure relief valves and did not include the elbows and or bolts that attached to the boiler.

---

[6] By the time of trial, Most had nonsuited her claims against the Emerson entities and Siemens, leaving Team as the sole defendant in her suit.

9

According to Gautney, the valve, relevant to this case, that had failed at the Jeffrey Energy Center, was safety relief valve ("SRV") 3-125, manufactured by Crosby. When Gautney inspected SRV 3-125, it looked as if it had been leaking before he got there. He realized that the valve could not be VR-certified. Westar loaned Gautney its Crosby valve reseating machine so that he could try to repair the valve. But the machine did not "clean up the seating surface" of the valve well enough, "so [Gautney] had to lap it." When Gautney "removed the machine from the valve," he noticed that the machining "didn't get all the pits and everything out of the seating surface," so there was a "loss in tolerance." Gautney told a Westar contact, either Jake Dailey or Wayne McAfee, that SRV 3-125 was not "up to code" and could not be a certified repair. Gautney and Whinery had "verbal agreements" with Westar to change Team's scope of work on SRV 3-125 to "noncode," and Gautney reassembled SRV 3-125 at Westar's instruction. According to Gautney, if a "customer change[d] the job" to a "noncertified repair," then he did not "have to meet the code standards." It was "[the customer's] valves and [its] decision" on what Gautney did "with the valves." Because the Jeffrey Energy Center was shut down when that decision was made, "[t]here was no immediate danger to life or property at the time, and [Gautney] did not believe that the valve [was] in an unsafe state." When he left the Jeffrey Energy Center in April 2018, Gautney suspected that SRV 3-125 might "lift early." That was "why [he] asked to be on-site," and he

10

understood that he was supposed to be back at the Jeffrey Energy Center when the plant started up. Gautney acknowledged that he did not have any documentation showing that Westar had agreed to a noncertified repair of SRV 3-125 and that Westar was on notice that Gautney had reassembled SRV 3-125 but suspected that it might fail its essential function.

Gautney further testified that during the Jeffrey Energy Center's plant shutdown, he told Dailey about all the pressure relief valves, including SRV 3-125, that had potential problems and needed to be monitored during the plant startup. Gautney also recalled a conversation that he had with Dailey in which he suggested that Westar "check in with [its] inspectors, to make sure that a valve repair not meeting standards would be okay for Westar to startup." If Dailey or McAfee had contacted him before startup, Gautney "would have been able to explain to them that [he] would like to be there on-site, so that way, [he] could be on that deck babysitting [SRV 3-125]."

Jerod Cox, a manager at Team's Broken Arrow office, testified by deposition that he spoke to Gautney while Gautney was on-site at the Jeffrey Energy Center in April 2018. Cox asked how the work "was going," and Gautney told him about "the condition of the [SRV 3-125]" and stated that a "repair should not be done." Cox responded that Gautney "needed to report to his Westar contact to make [Westar] aware of the condition of the valve." Gautney told Cox that "he was going to do

11

that." Cox understood that Team was to schedule Gautney and Whinery to return to the Jeffrey Energy Center "once [it] was up, or they were supposed to go back to be[] on-site during [the plant] startup."

Keaton Riddle, an operations manager at Jeffrey Energy Center in June 2018, testified by deposition that he was not scheduled to work at the plant on Sunday, June 3, 2018, but he drove there to take a co-worker to lunch to celebrate the co-worker's upcoming retirement. According to Riddle, he had picked up the co-worker and headed for the plant exit gate when he was "waved down" by a technician. During his conversation with the technician, Riddle heard what he thought might be a pressure "relief valve start[] relieving" and noticed that "there was steam emitting from a vent stack."

Riddle called the supervisor's office to alert the plant workers of the situation. Burchett answered the phone, and Riddle "notified him that steam was coming out of a vent," which he "assumed to potentially be a safety relief valve letting off." Riddle also heard "popping" sounds that "sounded like a steam engine." Riddle asked Burchett what was going on, and Burchett responded that they did not know but "would go look."

Soon after, Riddle received a text message telling him to return immediately to the Jeffrey Energy Center because there were "two badly burned supervisors in the control room." When he got inside, he discovered that Burchett and Henson had

been burned. "Their skin was ashy, white-colored, sloughing off," and "[t]hey were having a hard time breathing." Emergency crews were tending to them and giving them oxygen. Riddle called Most to let her know what had happened. "[A]t some point," Burchett and Henson were airlifted to the University of Kansas Hospital.

Thomas Ducheshneau testified by deposition that he was the control room operator on duty at the Jeffrey Energy Center on the day of the accident. Henson and Burchett came into the control room, "looked at the screens, and said [that] everything looked good." Then they asked Ducheshneau "how things were going," and he responded that "everything look[ed] pretty good." Ducheshneau noted that there was "nothing" that he knew of that was "on the control board that would give [him] any type of indication or alarm that would let [him] know of a steam leak."

According to Ducheshneau, Henson and Burchett then said "okay" and "walked out." But about three to five minutes later, they were screaming and banging on the emergency exit door, badly burned. "[T]heir eyes were black." Burchett's hair was burned off. Henson's tattoos were "gone," he had fingers "missing," and his skin "was hanging" and "falling everywhere." "[T]hey were dead men walking." Ducheshneau called for emergency assistance, and Henson and Burchett were airlifted to the hospital about forty-five minutes later.

McAfee testified by deposition that he oversaw all the contract labor at the Jeffrey Energy Center. He understood that Team's valve experts were supposed to

13

examine the safety relief valves, make sure that they were working properly, and if they were not, repair them until they could work properly, i.e., restore them to a condition that they could be VR stamped. McAfee also stated that he "fe[lt] like" Team's scope of work, which was described in the Team-Westar contract as to "inspect, repair, certify the safety relief valve," should also have included checking the discharge flange. McAfee acknowledged, though, that the scope-of-work provision in the Team-Westar contract did not say anything about Team checking the studs, the nuts that connected the drip pan elbow to the safety valve, or the discharge piping.

McAfee further testified that he did not recall any Team valve technician telling him that SRV 3-125 was unsafe during the Jeffrey Energy Center plant shutdown or that Team wanted to have a technician present when Westar started the plant up again. If he had been told, McAfee stated that he "would have remembered. It would have hit [him] in the face." They would not have restarted "the unit" without a repair, and "[i]t would have been fixed right." According to McAfee, if he had been told, he "would have [gone] to [his] plant manager," and they "would have stopped that unit," "repaired it," and had it VR stamped "in order . . . to bring it back up."

Most[7] testified that she and Henson began dating in 2006 and almost immediately became "inseparable." Henson was Most's "soulmate," her "protector," and the "love of [her] life." They were active people who enjoyed hiking, bicycling, and running together. They ran "a lot of [5k] races" together. They also enjoyed crafting, including making holiday decorations and building things out of wood. Henson built a "garden box" for Most, which she still had.

Most also stated that she and Henson wanted to grow their family. They tried early "in the marriage to have a child, and it just didn't work." In 2018, Most and Henson began looking into adopting "a four- or five-year-old little boy." They dreamed about Henson "teach[ing] him football and wrestling and tell[ing] him all the stories."

Most recounted that on the day that Henson was injured, she and her father went to the hospital burn unit. When the doctor described Henson's condition to her, she "couldn't believe what [she] was hearing." The doctor told her that Henson "had been steam burned" over ninety-five percent of his body and the only skin "that was still good was the bottom of his feet because of the soles of his shoes." The doctor also told Most that Henson appeared "gray and ashy" and was swollen. And the doctor told her that he "had just cut slits" into Henson's "skin to relieve the pressure" from the swelling. The doctor then warned Most that Henson's condition

---

[7] Most only appeared live at trial on the day she testified.

15

"was irreversible." Henson's "body was going to start shutting down," and Most "was going to have to decide when to let him go."

Most recalled that when she saw Henson, he was "covered with a sheet" up to his neck. His head was "three times the size it should have been," and he was "gray, ashy, [and] white." Most "let [Henson] know" that she was there. She did not touch him because she "didn't want to hurt him."

At first, Most told Henson to "fight." But after she "started to realize" that he could not "fight anymore," she told him, "Jesse, you got to go. I don't want you to fight." And she told Henson what the doctors and nurses had told her about his condition.

When Henson's kidneys began to shut down, a nurse told Most that it was time for her to decide how she "wanted to do this." After a chaplain came into the room, Most spent her final moments with Henson. She told him that his grandfather and mother were waiting for him and that she loved him and would always love him. Most did not "know if [Henson] heard" her, but she saw a "single tear f[a]ll down his cheek." "Shortly after that, his breathing slowed[,] and he passed."

Most explained that when Henson died, she "lost [her] best friend" and her "soulmate." She was "so lonely without him." She went "through the days like a robot," doing only what she had to do. According to Most, no one "want[ed] to be

around" her after Henson's death because she was "just sad to be around" and "[t]hey [did not] know what to say." She thought "they [felt] sorry for her."

Most also noted that she still kept Henson's clothes in the closet. And a friend had offered to make her a quilt from Henson's shirts, but Most turned down the offer because she could not bear the idea of "cutting up his shirts."

Most further stated that since Henson's death, she no longer hiked or rode her bike. She still made art because painting would "kind of quiet[] [her] mind for a while." The jury was shown one of her paintings, which she described as coming from her "loneliness" and "despair." It showed her sitting in moonlight "underneath a tree," surrounded by Henson's glasses, "boots, badge," and the flag she received at his funeral.

Darryl Henderson, M.D., a plastic and reconstructive surgeon and Most's medical expert, testified that seventy-five percent of his medical practice involved "reconstructive surgery, trying to put a patient who[] had a bad burn back together," and treating "long-term problems" caused by serious burns. Henderson reviewed Henson's hospital records and viewed a videotaped recording from the Jeffrey Energy Center's security camera of the accident that caused Henson's injuries.

According to Henderson, the steam that escaped and injured Henson, which was "about 800 degrees Fahrenheit," would have made "excruciating" and "devastating" burn injuries. After Henson's initial contact with the steam, some of

the burned skin would start "sloughing off," his "whole body" would start swelling, and his blood pressure would "start going down."

Henderson further explained that the superheated steam "basically dissolved the skin that it touched," so "the skin was dripping off and sloughing off [Henson's] body." "[A] very hot steam burn destroys the blood vessel and obstructs the blood vessel and stops getting blood flowing." Normal skin appears pink "because blood is flowing through there." But Henson's skin was "totally destroyed by the burn." "There [was] no blood left that[] [was] going through the skin, and so it [was] white and waxy."

Henderson understood that it took about thirty minutes for the ambulance to arrive at the Jeffrey Energy Center. The emergency medical technicians ("EMTs") who arrived then called a medevac helicopter to transport Henson to the hospital, and it took another fifteen minutes for the helicopter to arrive. Henson's medical records showed that during that forty-five-minute period, Henson, who was alert, did not receive any pain medication. According to Henderson, this meant that Henson was able to "perceive all the pain that the burn caused." The last two things Henson said before he was intubated were "I'm hurting everywhere" and "tell my wife I love her," which to Henderson meant that Henson was aware that he would die from his injuries.

From Henson's medical records, Henderson also understood that Henson's "[t]otal body surface area" was covered with second- and third-degree burns. Of all the types of injuries people could have, Henderson opined, a burn injury was "the most painful." And Henson's burns were so severe that they went "all the way down through the skin" and "destroy[ed] the nerve endings" as well as "the part of the nerve that [went] down to the fat or wherever the burn stop[ped]." That type of burn caused "a tremendous amount of pain because the . . . brain [would be] getting a lot of bizarre signals going to it that it c[ould not] understand."

Henderson further noted that the steam had damaged Henson's lungs, and the steam that entered his airway burned his "trachea and the bronchi[oles] going to his lungs as well," which would have made it difficult for him to breathe. Also, because of the extensive damage to his skin and the veins close to the skin surface, Henson could not be given fluids or medication intravenously. To receive fluids and medication, he had to have a hole drilled into his tibia, which was a painful procedure. And even with that intervention, Henderson believed that the medical staff at the hospital was not able to give Henson enough medication through the intraosseous line to put him in a medically induced coma.

Henderson noted that eventually, Henson went into "burn shock," which meant that his body "began to break down." The damage to his skin caused him to develop acidosis, which "c[ould] be fatal." Also, Henson's "kidneys

19

[we]re . . . damaged severely by the toxins" from his "dead skin." His "kidneys' job [wa]s to get rid of" all the toxins coming "from the dead tissue," but because "so much" of Henson's skin was dead and damaged, the toxins were "overwhelming" his kidneys. The burn shock also caused the blood pressure in Henson's brain to drop, which would have affected his perception of pain.

Henderson referred to Henson's hospital records observing that Henson "intermittently rais[ed]" his hands and at "[o]ne point, spontaneously raised bilateral arms." According to Henderson, those motions showed that Henson was in "pain and discomfort" and was "just not sedated very well at all." Henderson opined that Henson experienced extreme pain and suffering during the thirteen hours between his injury and his death.

Dr. William Hickerson, Team's medical expert, testified by deposition that he had forty years of experience as a physician. He was board certified in plastic surgery and was the former president of the American Burn Association.

Hickerson stated that in treating a patient whose condition was as serious as Henson, his goal would be to keep the patient sedated and "to keep [the patient] where they're not remembering anything . . . . You want to try to make it as amnestic as possible." The patient would receive medications that would lead to different degrees of sedation.

According to Hickerson, from the time that the EMTs were able to administer sedation fifty minutes after the accident, Henson appeared to have been kept sedated. The medical records showed that from the time Henson was first administered ketamine, a medication, he was unresponsive. The level of consciousness for a patient in Henson's condition depended on "many factors," not just the medications that the patient received. Hickerson explained that Henson was unconscious not only because of the "medications that he was getting," but because "he was also acidotic." A patient in the acidotic state that Henson was in "would be extremely unlikely to remember anything during that time."

Hickerson also testified that a combination of ketamine and another medication, such as fentanyl, like Henson received, would have put a patient "in a state" where he would not "remember anything" about what was "going on," or if he did, he "wouldn't care." Later, Henson's treating physicians stopped giving him ketamine but gave him other medications that did "the same thing" that ketamine did, "in addition to the fentanyl that [Henson had been] given."

According to Hickerson, ketamine was a "dissociative[]," so the patient would "not feel[] anything" and could "do whatever." Ketamine could cause burn patients who are otherwise sedated to move. Hickerson recounted that he used to use ketamine during a "burn wound excision" where he would "cut off the dead tissue.

And during that time period, [the patients would] talk to [him], they'd move. But they didn't remember anything."

In reviewing Henson's medical records, Hickerson noted that Henson "had corneal burns," and to treat that condition, drops would be administered, and the medical staff at the hospital would "put on a moisture chamber" that they covered with moistened "gauze on the outside." Under such circumstances, Hickerson explained, a patient would not be "making tears."

The jury found that both Team and Westar were negligent, apportioning Team ninety percent responsibility and Westar ten percent responsibility. As to compensatory damages for Most's survival claim, the jury found that Henson's estate was entitled to $27 million in damages for physical pain and $30 million in damages for mental anguish. As to compensatory damages for Most's wrongful death claim, the jury found that Most was entitled to $35 million for past loss of companionship and society and $40 million for future loss of companionship and society. The jury also found that Most was entitled to $45 million for past mental anguish and $45 million for future mental anguish.

The trial court entered judgment on the verdict, awarding Most $222 million in damages, and Team moved for a new trial.

In its motion for new trial, Team, among other things, asserted that the trial court should dismiss Most's claims against it for forum non conveniens. According

22

to Team, Most had tried her case "with no Texas evidence" despite her earlier argument that a Texas forum was necessary because, among other things, her case depended on Texas documents and witnesses. Further, Most, at trial, "did not link any action or inaction in Team's Texas offices to [Henson]'s death."

Team also asserted that the private interest factors considered in a forum non conveniens analysis favored Kansas, noting that Kansas, and not Texas, provided easier access to sources of proof and Kansas was where the accident had occurred. Further, Team asserted that Most was a Kansas citizen and Kansas "had a greater interest in protecting her."

Additionally, according to Team, trying Most's claims against it in Texas caused it to suffer substantial injustice. Team could not use compulsory process to secure the attendance of "the many important Kansas witnesses." Team's main defense was that it had told Westar about the problems with the condition of SRV 3-125 during the plant shutdown, but Westar denied that Team had done so. Despite witness credibility being a significant issue in the case, Gautney, who had agreed to travel from Oklahoma to testify, was the only fact witness to appear live at trial. All the other fact witnesses presented at trial, including those from Westar, had to appear by deposition.[8]

The trial court denied Team's motion for new trial.

---

[8] *See* TEX. R. CIV. P. 176.3.

## Order of Issues

"Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief." *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999); *see also* TEX. R. APP. P. 43.3. "But the general rule has exceptions." *Union Pac. R.R. v. Seber*, 477 S.W.3d 424, 436 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing Texas Rule of Appellate Procedure 43.3(b), which permits remand "in the interest of justice"). Here, Team's challenge to the trial court's denial of its motion to dismiss for forum non conveniens, if successful, would require the Court to vacate the trial court's judgment and dismiss the case. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b). Team, though, has also asked the Court to review the propriety of the trial court's choice-of-law ruling and the factual sufficiency of the evidence supporting the jury's noncompensatory damages findings. The relief available for those issues, if sustained, would fall short of vacatur, but because they are integral to the factors that the Court must balance in a forum non conveniens analysis, we consider them first. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b)(6) (court required to consider whether "stay or dismissal would not result in unreasonable duplication or proliferation of litigation"); *Quixtar Inc. v. Signature Mgmt. Team, LLC*, 315 S.W.3d 28, 33–34

24

(Tex. 2010) (public interest factors to consider in forum non conveniens determination include avoiding conflicts of law issues).

**Choice of Law**

In a portion of its first issue, Team argues that the trial court erred in refusing to apply Kansas law to Most's claims because Kansas law differs from Texas law and Kansas has the "most significant relationship" to Most's claims.

Which state's law governs a party's claims is a question of law for the court to decide. *Enter. Prods. Partners, L.P. v. Mitchell*, 340 S.W.3d 476, 479–80 (Tex. App.—Houston [1st Dist.] 2011, pet. dism'd); *see also Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008). Where, as here, the relevant contacts are not in dispute, we review the trial court's choice of law determination de novo. *Enter. Prods. Partners L.P.*, 340 S.W.3d at 480; *see also Sonat Expl. Co.*, 271 S.W.3d at 231. In wrongful death and survival actions involving injuries that occurred out of state, Texas courts must "apply the rules of substantive law that are appropriate under the facts of the case." TEX. CIV. PRAC. & REM. CODE ANN. § 71.031(c). If the applicable laws of the interested jurisdictions do not conflict, there is no need to decide which jurisdiction's law applies. *Vanderbilt Mortg. & Fin., Inc. v. Posey*, 146 S.W.3d 302, 313 (Tex. App.—Texarkana 2004, no pet.); *Vandeventer v. All Am. Life & Cas. Co.*, 101 S.W.3d 703, 711–12 (Tex. App.—Fort Worth 2003, no pet.); *Young Refin. Corp. v. Pennzoil Co.*,

46 S.W.3d 380, 385 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Texas courts may presume that another state's law is the same as Texas law absent proof or argument to the contrary. *Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex. 2006); *Cooper Indus., LLC v. Pepsi-Cola Metro. Bottling Co.*, 475 S.W.3d 436, 441 n.5 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

A trial court is required to take judicial notice of the laws of other states if the party requesting application of a foreign law provides the court with "sufficient information" for it to comply with the party's request. *See* TEX. R. EVID. 202; *Holden v. Capri Lighting, Inc.*, 960 S.W.2d 831, 833 (Tex. App.—Amarillo 1997, no pet.). The party requesting application of a foreign law has the initial burden of showing that the foreign law conflicts with Texas law. *Cooper Indus., LLC*, 475 S.W.3d at 441 n.5; *Scherer v. Tex. Coast Yachts, LLC*, No. 01-20-00412-CV, 2022 WL 2251816, at *8 (Tex. App.—Houston [1st Dist.] June 23, 2022, no pet.) (mem. op.). If the party requesting application of a foreign law does not provide sufficient information to reveal a conflict between Texas law and the law of another state, the trial court may exercise its discretion by choosing not to take judicial notice of the other state's law. *See Holden*, 960 S.W.2d at 833; *see also Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 769 (Tex. App.—Corpus Christi–Edinburg 1999, pet. denied) (inadequate proof of conflict between laws fails to overcome presumption that law of foreign jurisdiction is identical to that of Texas). If the party provides

26

sufficient information to show a conflict in the applicable substantive law of each jurisdiction, then Texas courts will apply the guidelines of the Restatement (Second) of Conflict of Laws section 6 as well as any other specific sections of the Restatement (Second) of Conflict of Laws that apply to the substantive legal issues. *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 443 (Tex. 2007); *Ins. Co. of State of Pa. v. Neese*, 407 S.W.3d 850, 853–54 (Tex. App.—Dallas 2013, no pet.).

## A.    Actual Conflicts Between Texas Law and Kansas Law

According to Team, it established that Texas law and Kansas law conflict on certain liability and damages issues.  Team first asserts that where, as here, a company is subject to vicarious liability, Texas law, unlike Kansas law, has not recognized theories of direct liability, such as negligence in training, hiring, or supervising.  *Compare Luvual v. Henke & Pillot*, 366 S.W.2d 831, 837–38 (Tex. App.—Houston 1963, writ ref'd n.r.e.) ("When agency and course and scope of employment were admitted, previous conduct became immaterial."), *with Marquis v. State Farm Fire & Cas. Co.*, 961 P.2d 1213, 1224 (Kan. 1998) (noting Kansas law recognizes "that an admission that the employee was acting within the scope of his or her employment does not preclude an action for both respondeat superior and negligent entrustment or negligent hiring, retention, or supervision").  Yet the Texas Supreme Court has not reached this issue, and our sister appellate court has indicated that the issue is unsettled.  *See JBS Carriers v. Washington*, 564 S.W.3d 830, 842

27

(Tex. 2018); *see also Werner Enter., Inc. v. Blake*, 672 S.W.3d 554, 587 (Tex. App.—Houston [14th Dist.] 2023, pet. filed) (trucking company's stipulation to respondeat superior liability did not preclude plaintiff from asserting direct theories of negligence, including negligent training, negligent supervision, negligent hiring, and negligent retention, against trucking company); *id.* at 625 (Wilson, J., dissenting) (court should adopt rule "under which an employer's admission that an employee was acting in the course and scope of his employment when the employee allegedly engaged in negligent conduct bars a party allegedly injured by the employee's negligence from pursuing derivative theories of negligence against the employer, subject to an exemplary damage exception"). Because Texas does not have a clear rule prohibiting a plaintiff from pursuing other theories of derivative negligence when the defendant has stipulated to respondeat superior, the trial court acted within its discretion in choosing not to take judicial notice of Kansas law on that issue. *See Holden*, 960 S.W.2d at 833; *see also* TEX. R. EVID. 202.

Team next asserts that unlike Texas law, Kansas law does not recognize joint and several liability. *Compare* TEX. CIV. PRAC. & REM. CODE ANN. § 33.013(b)(1) (defendant found responsible for greater than fifty percent of harm is jointly and severally liable with other persons that contributed in some way to harm), *and Lakes of Rosehill Homeowners Ass'n v. Jones*, 552 S.W.3d 414, 422 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (trial court erred in concluding that common-law rule of

28

joint and several liability for indivisible injury did not survive enactment of Texas Civil Practice and Remedies Code Chapter 33), *with* KAN. STAT. ANN. § 60-258a(d) ("When the comparative negligence of the parties is an issue and recovery is permitted against more than one party, each party is liable for that portion of the total dollar amount awarded as damages to a claimant in the proportion that the amount of that party's causal negligence bears to the amount of the causal negligence attributed to all parties against whom recovery is permitted."). Here, the jury was asked to find the percentage of negligence attributable to Team and Westar, and it found Team ninety percent negligent and Westar ten percent negligent for causing or contributing to cause Henson's injuries and death. Yet, the trial court's judgment holds Team responsible for 100 percent of the damages found by the jury. This award complies with Texas law but conflicts with Kansas law.

Finally, Team asserts that pertinent Kansas damages law conflicts with Texas damages law, explaining that while Texas law has no set limit on the amount of noneconomic damages that can be recovered in wrongful death and survival actions, Kansas has limited by statute the amount of noneconomic damages that can be recovered for those claims. *See* KAN. STAT. ANN. § 60-1903(b) (capping noneconomic wrongful death damages at $250,000); *id.* § 60-19a02 (capping noneconomic personal injury damages at $300,000).

In a wrongful death action, the statutory cap under Kansas law is in actual conflict with Texas law, which imposes no such limits on the recovery of noneconomic damages. Most suggests that there are questions about the validity of Kansas Statutes section 60-1903(b), but we disagree. The Kansas Supreme Court has expressly held that the section 60-1903(b) noneconomic damages cap is constitutional. *See Tillman v. Goodpasture*, 485 P.3d 656, 666 (Kan. 2021) (reaffirming same holding in *Adams v. Via Christi Regional Medical Center*, 19 P.3d 132, 139 (Kan. 2001) and *Leiker v. Gafford*, 778 P.2d 823, 850 (Kan. 1989), *overruled in part on other grounds by Martindale v. Tenny*, 829 P.2d 561, 628–29 (Kan. 1992)).

The Kansas Supreme Court has not specifically addressed the constitutionality of Kansas Statutes section 60-19a02 as applied to a survival action, but it has held that section 60-19a02's cap "is facially unconstitutional because it violates section 5 of the Kansas Constitution Bill of Rights."[9] *Hilburn v. Enerpipe Ltd.*, 442 P.3d 509, 524 (Kan. 2019). At the outset of its analysis, the *Hilburn* court observed that Kansas Constitution section 5 "preserves the jury trial right as it historically existed

---

[9] Team suggests that only a plurality of the justices signed on to this holding, but it was joined by four justices of the seven-member Kansas Supreme Court. *See Hilburn v. Enerpipe Ltd.*, 442 P.3d 509, 509, 524 (Kan. 2019) (noting chief justice did not participate in decision); *id.* at 525, 527 (Stegall, J., concurring) ("As set forth in the majority opinion, [Kansas Statutes section 60 19a02] violates section 5 of the Kansas Constitution Bill of Rights."); *id.* at 531, 543 (Luckert, J., joined by Biles, J., dissenting); *see also* KAN. CONST. art. 3, § 2.

at common law" when the state constitution "came into existence." *Id.* at 514. Yet in declaring that section 60-19a02 was facially unconstitutional, the court did not limit its holding to common-law actions. *See id.* at 524.

Team points out that the Kansas Supreme Court's decision in *Tillman* reiterated that the constitutional jury-trial right recognized in *Hilburn* applied only to protect "traditional common-law causes of action," and Team asserts that we should extend that reasoning to conclude that the application of Kansas Statutes section 60-19a02 to Most's survival claim does not violate Kansas's constitutional right to a jury trial. But we are constrained by the plain language of *Hilburn*'s holding. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 & n.3 (Tex. 1984) (in applying law from another jurisdiction, Texas courts must assume that legal authority from jurisdiction correctly states rule). When a statute is held to be facially unconstitutional, the statute by its terms operates unconstitutionally in every application. *See Appraisal Rev. Bd. of Galveston Cnty. v. Tex–Air Helicopters, Inc.*, 970 S.W.2d 530, 534 (Tex. 1998); *Barshop v. Medina Cnty. Underground Water Conserv. Dist.*, 925 S.W.2d 618, 623 (Tex. 1996); *Houston Firefighters' Relief & Ret. Fund v. City of Houston*, 579 S.W.3d 792, 806 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *accord State v. Valdiviezo-Martinez,* 486 P.3d 1256, 1267 (Kan. 2021); *In re Appeal of Weisgerber*, 169 P.3d 321, 327 (Kan. 2007). Our role in determining another state's law does not extend to determining whether the

31

applicable statute could theoretically withstand a state constitutional challenge. *See Duncan*, 665 S.W.2d at 420 & n.3. Thus, we do not perceive an actual conflict between Texas law and Kansas law as to the amount of noneconomic damages available for a survival action.

## B.  Kansas Law Applies

Because Team established actual conflicts between Texas law and Kansas law on the issues of joint and several liability and the amount of noneconomic damages available for a wrongful death action, we next consider whether the trial court erred in applying Texas law, rather than Kansas law, to those issues. *See Alarcon v. Velazquez*, 552 S.W.3d 354, 360 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("The Restatement methodology requires a separate conflict-of-laws analysis for each issue in a case."); *see also BDO Seidman, LLP v. Bracewell & Patterson, LLP*, No. 05-02-00636-CV, 2003 WL 124829, at *2 (Tex. App.—Dallas Jan. 16, 2003, pet. denied) (mem. op., not designated for publication) ("[T]he substantive law applicable to the underlying tort action is not automatically applicable to a defendant's contribution claim.").

The Restatement (Second) of Conflict of Laws section 6 sets out general factors relevant to the choice of law:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (AM. L. INST. 1971)); *see also Enter. Prods. Partners*, 340 S.W.3d at 480.

In applying the general conflict of laws principles to tort cases like this one, Restatement (Second) of Conflict of Laws section 145 declares that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [section] 6." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1); *see also Enter. Prods. Partners*, 340 S.W.3d at 480.

Section 145 provides the following specific factors to consider:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

33

(d) the place where the relationship, if any, between the parties is centered.

*Torrington Co.*, 46 S.W.3d at 848 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2)); *see also Enter. Prods. Partners*, 340 S.W.3d at 480.

The Restatement (Second) of Conflict of Laws then further refines the choice-of-law analysis applicable to personal injury (section 146) and wrongful death (section 175) claims. For such claims,

> the law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in [section] 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 146, 175. The Restatement (Second) of Conflict of Laws also weighs in on situations where the alleged negligent conduct and the injury occurred in different states, commenting that "[i]n such instances, the local law of the state of injury will usually be applied to determine most issues involving the tort." *See id.* §§ 146 cmt. e, 175 cmt. f.

According to Restatement (Second) of Conflict of Laws sections 146 and 175, then, we must presume, as the starting point for our analysis, that Kansas law applies to determine proportionate responsibility. We will then consider the various factors identified in the Restatement to guide us in determining whether Texas has a greater interest in the determination of the particular issue than Kansas, the state where the injury occurred. *See id.* § 175 cmt. d. (also providing that courts should examine

34

"the purpose sought to be achieved by their relevant local law rules and of the particular issue involved"). The number of contacts with a state is not determinative; rather, we evaluate the contacts in light of the state policies underlying the particular substantive issue. *Torrington Co.*, 46 S.W.3d at 848; *Enter. Prods. Partners*, 340 S.W.3d at 481.

Most asserts that the injury's occurrence in Kansas was "fortuitous," and as a result, the fact that the injury occurred in Kansas is "entitled to minimal weight." Most makes this assertion because Restatement (Second) of Conflict of Laws section 145(2) comment e explains that "the place of injury will not play an important role in the selection of the state of the applicable law" when, for example, "the place of injury can be said to be fortuitous." *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) cmt. e. Most points out that Team is a global company with valve technicians in plants "all over the world" who "travel[] all over the country" to perform services for Team. She further notes that "Gautney and Whinery d[id] not live or regularly work in Kansas," and they spent only a few days at the Jeffrey Energy Center. According to Most, Team's negligent conduct "could easily have happened anywhere in the country."

Whether Team's conduct could have happened anywhere, though, does not mean that the injury's occurrence in Kansas was fortuitous. "Fortuitous" means "[o]ccurring by chance; accidental." BLACK'S LAW DICTIONARY (11th ed. 2019).

The evidence shows that Westar, a Kansas utility company, contacted Team's Broken Arrow office and requested that Team provide valve maintenance services at the Jeffrey Energy Center, one of Westar's electric power plants in Kansas. Team and Westar entered into a service contract governed by Kansas law, and Team sent two valve technicians from Oklahoma to Kansas to provide the services described in the Team-Westar contract. We also note that Henson and Most lived in Kansas, and Henson worked for Westar at the Jeffrey Energy Center in Kansas. Their injuries did not occur in Kansas by chance. *See, e.g.*, *Toyota Motor Co. v. Cook*, 581 S.W.3d 278, 285 (Tex. App.—Beaumont 2019, no pet.) (that accident occurred in Mexico was not fortuitous where van involved in accident was directly imported from Japan to Mexico, sold in Mexico to Mexican national, and used exclusively in Mexico). Under the circumstances, Henson's work-related injuries could not have occurred anywhere but Kansas. *See Crisman v. Cooper Indus.*, 748 S.W.2d 273, 279 (Tex. App.—Dallas 1988, writ denied). Thus, we apply Kansas law to determine proportionate liability and damages unless Texas has a more significant relationship.

"[T]he most important contacts in determining which state's law governs compensatory damages will usually be the ones with the most direct interest in the plaintiff's monetary recovery and/or the most direct in protecting the defendant against financial hardship." *Torrington Co.*, 46 S.W.3d at 849 (internal quotations

36

omitted). "[A] plaintiff's domiciliary state usually has a strong interest in seeing its compensatory damages law applied." *Id.* at 850.

In the cases cited by Team, *Cook* and *Crisman*, the Texas appellate courts concluded that the location where the defective product was sold had the stronger interest in having its products liability laws applied. *See Cook*, 581 S.W.3d at 285 (noting Mexico's restrictions on tort claims and recovery demonstrated policy interest in protecting Mexicans from excessive liability claims and Mexico's investigation of crash, which led to conclusion that van's driver was criminally responsible, demonstrated policy interest in applying Mexican law); *Crisman*, 748 S.W.2d at 280 (Florida had stronger policy interest in applying its laws to action because Florida had greater interest in regulating products sold in Florida and in controlling operation of vehicles on its highways). Similarly, Kansas has a strong interest in holding out-of-state businesses that provide services in Kansas responsible when their negligent conduct causes injuries to a Kansas citizen in Kansas. Kansas also has an interest in ensuring that its utility companies are held responsible when their own negligence contributes to the injuries of a Kansas citizen.

Texas may have some interest in ensuring that the nationwide activities of its corporate citizens satisfy a certain standard of care. But the applicable standard of care may vary from jurisdiction to jurisdiction. For example, the Jeffrey Energy

Center's operations must comply with the Kansas Boiler Safety Act.[10] Here, Texas's

interest in overseeing the out-of-state conduct of its corporate citizens is not as

compelling as Kansas's interest in ensuring the safe operation of its utilities and in

holding all parties who interfere with the safety of those operations responsible for

any harm they cause.[11]

---

[10] *See* KAN. STAT. ANN. §§ 44-913–44-933 (Kansas Boiler Safety Act). Although both Texas and Kansas apply standards set by the National Board of Boiler and Pressure Vessel Inspectors, they do not both adopt the same edition of the National Board Inspection Code. *Compare* KAN. ADMIN. REGS. § 49-45-20 (adopting by reference 2007 edition of National Board Inspection Code Parts 1, 2, and 3), *with* TEX. ADMIN. CODE ANN. § 65.612 (requiring repairs and alterations to "conform to the current edition of the National Board Inspection Code"). "The [National Board Inspection Code] is published as a new edition in July of odd numbered years (2017, 2019, 2021, 2023)." NATIONAL BOARD INSPECTION CODE (NBIC), https://www.nationalboard.org/index.aspx?pageID=4#:~:text=The%20NBIC%20is%20published%20as,2019%2C%202021%2C%202023) (last visited Apr. 24, 2024). Team pointed out in the trial court that the National Board Inspection Code added a new Part 4 that deals with pressure relief devices, such as those at issue here, in 2017, making it part of the regulatory scheme for Texas but not for Kansas. *See* Nat'l Bd. of Boiler & Pressure Vessel Inspectors, NAT'L BOARD INSPECTION CODE (2017 ed.).

[11] Most states that Team provided some training courses in Texas for its valve technicians and Gautney called a Team employee in Texas for guidance on the valve repair in Kansas. But the evidence did not identify either of these contacts as the negligent conduct that caused the injuries, so they do not factor into our analysis. And because Team did not train its employees exclusively in Texas, any failure to provide adequate training is not necessarily attributable to Texas. Texas's interest in such conduct is not enough to displace the interest of Kansas, where the injuries occurred. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 146 cmt. e, 175 cmt. f (AM. L. INST. 1971) (where alleged negligent conduct and injury occurred in different states "the local law of the state of injury will usually be applied to determine most issues involving the tort").

Further, in placing limits on certain noneconomic damages, the Kansas legislature made a clear policy choice in balancing its citizens' interest in receiving fair compensation for their injuries and the state's interest in maintaining a favorable business climate. *See Crisman*, 748 S.W.2d at 279 (Florida legislature's enactment of statute of repose showed state's concern in area of products liability); *see also Torrington Co.*, 46 S.W.3d at 850 ("[A] plaintiff's domiciliary state usually has a strong interest in seeing its compensatory damages law applied."). Applying Kansas law on these issues is not difficult, and it promotes the certainty, predictability, and uniformity of the results in such cases.

Based on the foregoing, we hold that the trial court erred in applying Texas law, rather than Kansas law, to hold Team responsible for 100 percent of the damages found by the jury despite the jury's findings that Team was ninety percent liable and Westar was ten percent liable, and it also erred in declining to apply Kansas law's noneconomic damages caps to the jury's damages award on Most's wrongful death claim.

We sustain in part the portion of Team's first issue challenging the trial court's application of Texas law.

**Noneconomic Damages**

In its second issue, Team argues that the trial court erred in awarding Most the amount of noneconomic damages found by the jury because it was excessive and

resulted from Most's arguments encouraging the jury to punish Team. In its third issue, Team argues that the trial court erred in empaneling and instructing the jury because those actions contributed to the excessiveness of the jury's damages award.

An excessive damages complaint is a challenge to the factual sufficiency of the evidence supporting the damages award. *See Anderson v. Durant*, 550 S.W.3d 605, 620 & n.66 (Tex. 2018); *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998); *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 796 (Tex. App.—Houston [1st Dist.] 2004, no pet.). When a party attacks the factual sufficiency of an adverse finding on an issue on which it did not have the burden of proof at trial, it must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Four J's Cmty. Living Ctr., Inc. v. Wagner*, 630 S.W.3d 502, 516 (Tex. App.—Houston [1st Dist.] 2021, pet. denied). In conducting a factual-sufficiency review, we examine, consider, and weigh all evidence that supports or contradicts the jury's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). As in a legal-sufficiency review, we recognize the jury as the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). If we conclude that the evidence is factually insufficient and that the

award of damages is therefore excessive, then we must detail why we reach that result. *C.M. Asfahl Agency*, 135 S.W.3d at 797.

Appellate courts must review noneconomic damage awards to confirm that they are not the result of passion or prejudice. *Gregory v. Chohan*, 670 S.W.3d 546, 576 (Tex. 2023) (Bland, J., concurring in part); *see also id.* at 563 (plurality op.) (observing plaintiff's "only arguments provided to justify an amount of damages were impermissible appeals to irrelevant considerations"). As a type of compensatory damages, noneconomic damages' purpose is to make a plaintiff whole for any losses caused by the defendant's interference with the plaintiff's rights by placing the plaintiff in the position that she would have been in absent the defendant's tortious conduct. *In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 250 (Tex. 2021) (orig. proceeding); *J & D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 655 (Tex. 2016); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 16 (Tex. 1994); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(8) ("'Compensatory damages' means economic and noneconomic damages. The term does not include exemplary damages."); *id.* § 41.001(12) ("'Noneconomic damages' means damages awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind *other than*

41

*exemplary damages.*" (emphasis added)); *see also Four J's Cmty. Living Ctr.*, 630 S.W.3d at 516. Where the compensatory damages sought are purely noneconomic, courts have a duty to ensure that the damages awarded "are the result of a rational effort, grounded in the evidence, to *compensate* the plaintiff for the injury." *Gregory*, 670 S.W.3d at 550 (plurality op.).

Before we can measure the factual sufficiency of the evidence supporting the jury's noneconomic damages award, we must identify the standard against which the evidence is to be measured. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002). If there was no objection to the jury charge, then the charge actually submitted is the proper measure of the sufficiency of the evidence. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Here, Team objected to the trial court's charge on the grounds that the jury should be instructed under Kansas law, not Texas law, and it tendered a proposed charge following Kansas law with instructions on noneconomic damages, including damages for mental anguish, suffering, and loss of companionship. We do not perceive any actual conflict between the proposed Kansas law jury instructions on these elements and Texas law, and neither party asserts that a factual sufficiency analysis of them would be different under Kansas law. Thus, we apply Texas law to the issue of whether the evidence is factually sufficient to support the jury's noneconomic damages award. *See Cooper Indus.*, 475 S.W.3d at 441 n.5.

Mental anguish is compensable only if it causes a "substantial disruption in daily routine or a high degree of mental pain and distress." *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). This requires "direct evidence of the nature, duration, and severity of the[] [plaintiff's] mental anguish, thus establishing a substantial disruption to the plaintiff's daily routine." *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 544 (Tex. 2018). Consistent with the trial court's jury charge definition, "[l]oss of companionship and society means the loss of the positive benefits flowing from the love, comfort, companionship, and society" that the plaintiff, in reasonable probability, would have received from the decedent had he lived. *See Moore v. Lillebo*, 722 S.W.2d 683, 687–88 (Tex. 1986). There must be both evidence of the existence of compensable mental anguish or loss of companionship and evidence to justify the amount awarded. *See Gregory*, 670 S.W.3d at 555 (plurality op.); *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002).

For her wrongful death claim, the jury awarded Most $45 million for past mental anguish, $45 million for future mental anguish, $35 million for past loss of companionship and society, and $40 million for future loss of companionship and society. In total, the amount of noneconomic damages awarded for Most's wrongful death claim alone was $165 million, more than ten times the $15,065,000 noneconomic damages award reversed by the Texas Supreme Court in *Gregory*. *See* 670 S.W.3d at 553 (plurality op.).

Most's testimony at trial painted a tragic picture, from her initial shock about Henson's condition and her insistence that Henson "fight," to her gradual realization that he could not "fight anymore." Most explained that she had to make the excruciating decision to terminate life support and stand by Henson in his final moments.

Most also described her loneliness after Henson, whom she described as her "soulmate," died. She did only what she had to do, performing tasks like a "robot." It seemed to her that no one "want[ed] to be around" her after Henson died because she was "just sad to be around" and "[t]hey [did not] know what to say." She could not bear to part with Henson's belongings or go on hikes or bike rides like she and Henson used to do together. Her only solace was in her art.

For her survival claim, the jury awarded Most $27 million for Henson's pain and suffering and $30 million for his mental anguish. Evidence of damages in support of Most's survival claim included testimony from Henson's co-worker, who witnessed Henson's condition immediately following the steam release until Henson was intubated by the EMTs. Henson's body was covered with second- and third-degree burns, and the superheated steam had also damaged his trachea and lungs. Henson did not receive any pain medication until forty-five minutes after he was burned, and the parties' experts disagreed about whether he was medicated

enough to relieve his pain and suffering between the time he first received medication and his death several hours later.

Most did not seek any economic damages, which, if she had, may or may not have provided some basis for the jury to determine an appropriate amount of noneconomic damages. *See Gregory*, 670 S.W.3d at 559–60 (plurality op.); *id.* at 569 (Devine, J., concurring). And she did not propose any amount of money that she believed would compensate her for the mental anguish and loss of companionship she experienced. The jury heard only argument from Most's counsel about what would be an appropriate damages award.

But Most's counsel's arguments for noneconomic damages were "based on standards that depart[ed] from the evidence." *Id.* at 576 (Bland, J., concurring in part). As the Texas Supreme Court has observed, it is improper for a plaintiff to argue for damages based on "unsubstantiated anchoring," that is, by "reference to objects or values with no rational connection to the facts of the case," such as "the cost of a fighter jet" or "the auction price of a coveted painting." *Id.* at 558 (plurality op.); *see also Alonzo v. John*, No. 22-0521, 2024 WL 2095957, at *3 n.1 (Tex. May 10, 2024) (*Gregory* "clarified that claimants cannot rely on unsubstantiated anchoring to sustain a damages award."); *Gregory*, 670 S.W.3d at 569 (Devine, J., concurring). Such comparisons have "nothing to do with the emotional injuries suffered by the plaintiff and cannot rationally connect the extent of the injuries to

45

the amount awarded." *Id.* at 558 (plurality op.). Also pertinent, damages awards for mental anguish or loss of companionship "are not meant to place a value on human life." *Id.* (plurality op.).

Yet here, Most's counsel, by suggesting that the jury compare the cost of an expensive painting to the value of a human life, did exactly what the *Gregory* court deemed improper. For instance, in his opening argument, counsel stated:

> You may see a headline, painting sells for $350 million, right. That's what somebody who owned it was willing to sell it for. It's a bargain. It's a deal. It's a price, fair and reasonable. I don't think there is a person that would say that a painting is more valuable than a human life.

And Most's counsel returned to this theme in his closing argument, suggesting that "[t]he hard part of [the jury's] job . . . [was] valuing the whole person, [and] valuing the entire loss." And counsel stated, "if you picked 300 million because you can make an exchange for a painting, then that's okay."

The effect of these improper arguments to the jury was compounded by the exemplary damages evidence and themes that remained before the jury even after Most abandoned her claim for exemplary damages at the jury charge conference, after the close of evidence.[12] The Texas Supreme Court has cautioned that an award

---

[12]    "'Exemplary damages' means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages are neither economic nor noneconomic damages." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(5).

of noneconomic damages must "fairly and reasonably compensate" for the loss and must not be disguised as disapproval or punishment of the defendant. *Bentley v. Bunton*, 94 S.W.3d 561, 605, 607 (Tex. 2002); *see also Reliance Steel & Alum. Co. v. Sevcik*, 267 S.W.3d 867, 870 (Tex. 2008) (party's size and wealth generally "has no logical relevance to a case," but "the prejudicial effect of such evidence often creates strong temptations to use it").

The record here shows that the jury was presented with substantial evidence and argument relevant only to exemplary damages throughout trial. Most's counsel first raised the issue of exemplary damages during voir dire, asking the jury panel members what they thought about punitive damages and whether they could "award millions and millions of dollars in punitive damages" if the circumstances warranted it.

During his closing argument, Most's counsel continued to raise themes that had no relevance apart from a claim for exemplary damages. He emphasized Team's size, telling the jury that Team was "the largest valve inspection company in the country," was "publicly traded on the New York Stock Exchange," had "offices in multiple countries," and had "thousands of employees doing this work." Most's counsel also asserted that if Team had been acting with integrity, it would have "admit[ted] its wrong" and it would have "do[ne] something to fix the situation to make sure it would never happen again." Additionally, he accused Team of

"diminish[ing] the value of a life well lived" and "disrespect[ing] the process of th[e] trial." Most's counsel urged the jury to "let Team know" by its verdict that such "behavior [was] not acceptable." He told the jury that they had to "put a price on it" to give Team the message "that life [was] not cheap, the value of life [was] not on sale," and that it was "not to be discounted," "disrespected," or "diminished." And he cautioned the jury that Team would "not change, unless [they] ma[d]e [it] change," and if the jury did not, "then Team just gets away with it."[13]

These improper arguments left the jury with no sound guidance for deciding the amount of compensation to award Most for mental anguish and loss of companionship. *See Gregory*, 670 S.W.3d at 551 (plurality op.). For this reason, we cannot say that the damages award is not the result of passion or prejudice. *See id.* at 576 (Bland, J., concurring in part); *see also id.* at 563 (plurality op.) (jury's decision "cannot be based on noncompensatory motivations"); *id.* at 577 (Devine,

---

[13] Because Team did not ask the trial court to bifurcate the proceeding, exemplary damages issues were properly raised throughout the trial. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.009; *see also Crowder v. Sanger*, No. 03-21-00291-CV, 2023 WL 4631501, at *6 (Tex. App.—Austin June 30, 2023, no pet.) (mem. op.) (noting "legislature considers liability issues so distinct from exemplary damages" that trial may be bifurcated to permit jury to make liability and exemplary damage findings in separate parts of trial). When Most abandoned her exemplary damages claim during the jury charge conference, Team requested that the trial court include an instruction in its charge to the jury "that the compensatory damages, if any, [it] award[ed] in answer to th[e] question [were] not allowed as a punishment and must not be imposed or increased to penalize Team." The trial court, though, rejected Team's requested instruction and did nothing to otherwise put the jury on notice that it should disregard the evidence relevant to the exemplary damages because it was no longer relevant to any issue in the case.

J., concurring) (plaintiff's counsel's directives to base mental anguish damages on passion and prejudice rendered verdict legally infirm). Thus, we conclude that the damages are not supported by the evidence, and we hold that the trial court erred in entering judgment on the jury's damages findings.

We sustain Team's second and third issues.

Generally, a suggestion of remittitur is appropriate to enter in cases where there is insufficient evidence to support the full amount of a damages award. *Id.* at 564–65 (plurality op.); *see also* TEX. R. APP. P. 46.3. But if we cannot readily determine an appropriate lesser amount of damages from the evidence, we may reverse and remand for new trial. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010) (observing court of appeals could decide to remand for new trial on lost profit damages if evidence did not seem conducive to remittitur). Here, the evidence does not reveal any definite amount of noneconomic damages that would make Most whole; the arguments of her counsel, which impermissibly relied on punitive themes, were the only apparent source for the amount of noneconomic damages found by the jury. For this reason, reversal and remand for new trial would be the proper disposition.

Because we have concluded that a new trial is required, a dismissal for forum non conveniens at this juncture "would not result in unreasonable duplication or proliferation of litigation." TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b). We

also note that by the time of trial, Most had nonsuited her claims against the Emerson

entities and Siemens, leaving Team as the sole defendant and the only party that was

a Texas resident.  And in trying her case, Most did not focus on any Team conduct

in Texas and did not call any Texas witnesses.  In short, the case that Most tried bore

little resemblance to the one addressed in the mandamus proceedings previously

adjudged by this Court and the Texas Supreme Court.[14]  As Team renewed its request

for forum non conveniens dismissal when it moved for new trial, we next review the

issue as it was presented to the trial court at that time.

## Forum Non Conveniens

In the remaining portion of its first issue, Team argues that the trial court erred

in refusing to dismiss Most's suit against it based on forum non conveniens because

when "personal injury and wrongful death actions [are] more properly heard in

---

[14]   Early in this case, the Emerson entities filed a petition for writ of mandamus seeking reversal of the trial court's denial of their motion to dismiss for forum non conveniens, and Team filed a response joining in the petition.  This Court denied relief, concluding that the Emerson entities had "failed to establish that the trial court abused its discretion." *In re Emerson Process Mgmt. Valve Auto., Inc.*, No. 01-19-00152-CV, 2019 WL 1996517, at *1 (Tex. App.—Houston [1st Dist.] May 7, 2019, orig. proceeding [mand. denied]) (mem. op.).  The Texas Supreme Court denied Team's subsequent petition for mandamus relief without opinion.  These prior rulings do not affect our analysis of the forum non conveniens issue presented in this appeal.  Because the parties and claims are not substantially the same as they were when the petitions for writ of mandamus were ruled on, and because Team renewed its request for forum non conveniens dismissal after trial, the law of the case doctrine does not apply here. *See Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986).

.

50

another forum[,] [they] must be dismissed," the trial court had a "statutorily mandated duty to stay or dismiss" the case for forum non conveniens, and "Most used misdirection to avoid an adverse forum non conveniens ruling at the [suit's] inception." (Emphasis omitted.)

An appellate court will reverse a trial court's forum non conveniens determination if the record shows a clear abuse of discretion. *See Quixtar*, 315 S.W.3d at 31; *Brenham Oil & Gas, Inc. v. TGS NOPEC Geophys. Co.*, 472 S.W.3d 744, 766 (Tex. App.—Houston [1st Dist.] 2015, no pet.). A trial court abuses its discretion when it acts without reference to guiding rules or principles. *Quixtar*, 315 S.W.3d at 31. When "all the factors do not conclusively favor the alternative forum[,] . . . we cannot say that the trial court abused its discretion in denying" a motion to dismiss for forum non conveniens. *In re Mahindra, USA*, 549 S.W.3d 541, 550 (Tex. 2018) (orig. proceeding); *In re Friede & Goldman, LLC*, No. 01-18-00409-CV, 2019 WL 2041071, at *3 (Tex. App.--Houston [1st Dist.] May 9, 2019, orig. proceeding) (mem. op.).

"[F]orum non conveniens is essentially 'a supervening venue provision . . . that goes to process rather than substantive rights—determining which among various competent courts will decide the case.'" *In re Mahindra*, 549 S.W.3d at 547 (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994)). Dismissal for forum non conveniens is appropriate when sufficient contacts between the

defendant and the forum state exist to confer personal jurisdiction, but the case itself has no significant connection to the forum state. *In re Bridgestone Ams. Tire Operations, LLC*, 459 S.W.3d 565, 568 (Tex. 2015) (orig. proceeding); *In re XTO Energy, Inc.*, No. 01-17-00652-CV, 2018 WL 2246216, at *4 (Tex. App.—Houston [1st Dist.] May 17, 2018, orig. proceeding) (mem. op.).

Most's suit involved claims for personal injury and wrongful death, so statutory forum non conveniens applies. *See* Tex. Civ. Prac. & Rem. Code Ann. § 71.051(i); *In re Mahindra*, 549 S.W.3d at 544. Texas Civil Practice and Remedies Code section 71.051 provides six factors for the trial court to consider in deciding whether to dismiss a suit on forum non conveniens grounds, namely, whether:

(1) an alternative forum exists in which the claim or action may be tried;

(2) the alternative forum provides an adequate remedy;

(3) maintenance of the claim or action in the courts of this state would work a substantial injustice to the moving party;

(4) the alternative forum, as a result of the submission of the parties or otherwise, can exercise jurisdiction over all the defendants properly joined to the plaintiff's claims;

(5) the balance of the private interests of the parties and the public interest of the state predominate in favor of the claim or action being brought in an alternate forum, which shall include consideration of the extent to which an injury or death resulted from acts or omissions that occurred in this state; and

(6) the stay or dismissal would not result in unreasonable duplication or proliferation of litigation.

52

TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b). In applying these statutory factors, a trial court has no discretion in determining what the law is or in applying the law to the particular facts. *In re Mantle Oil & Gas, LLC*, 426 S.W.3d 182, 187 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding); *see In re Transcont'l Gas Pipeline Co.*, 542 S.W.3d 703, 715 (Tex. App.—Houston [14th Dist.] 2017, orig. proceeding); *see also In re ENSCO Offshore Int'l Co.*, 311 S.W.3d 921, 927 (Tex. 2010) (orig. proceeding) (trial court may not assign different weights to statutory factors; if all factors weigh in favor of claim being heard in forum outside Texas, trial court must grant motion and decline to exercise jurisdiction).

The trial court also must consider whether the plaintiff is a Texas resident because the factors applied in a forum non conveniens determination are balanced differently when, as in this case, a nonresident plaintiff has chosen Texas as the forum. *See Quixtar*, 315 S.W.3d at 31–32. If the plaintiff is not a Texas resident, the presumption that she "filed in Texas as a matter of convenience applies with less force and deserves substantially less deference than it would if [the plaintiff] were a Texas resident." *Id.* at 33; *see also In re XTO Energy*, 2018 WL 2246216, at *4; *Grynberg v. Grynberg*, 535 S.W.3d 229, 234 (Tex. App.—Dallas 2017, no pet.).

The forum non conveniens statute does not place the burden of proof on either party. *In re Mahindra*, 549 S.W.3d at 550; *In re XTO Energy*, 2018 WL 2246216, at *4. "To the extent [that] evidence is necessary to support the positions of the

parties," courts must weigh the factors based "on the weight of the evidence" and are "entitled to take into account the presence or absence of evidence as to some issue or position of a party." *In re Gen. Elec. Co.*, 271 S.W.3d at 687; *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258–59 (1981) (movant for forum non conveniens dismissal must offer enough information to permit trial court "to balance the parties' interests"). The trial court must determine the proper forum based on the greater weight of the evidence. *In re Mahindra*, 549 S.W.3d at 550. If the statutory factors weigh in favor of the claim or action being more properly heard in a forum outside of Texas, Texas Civil Practice and Remedies Code section 71.051 "requires dismissal of the claim or action." *In re Gen. Elec. Co.*, 271 S.W.3d at 686; *see In re Weatherford Int'l, LLC*, No. 22-1014, --- S.W.3d ---, 2024 WL 1819829, at *2 (Tex. Apr. 26, 2024); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b).

Most has not disputed that three of the six factors set forth in Texas Civil Practice and Remedies Code section 71.051 favored dismissal of her suit: Kansas was an alternate forum where her claims could be tried (factor one); Kansas provided an adequate remedy (factor two); and Kansas could exercise jurisdiction over all the properly joined defendants (factor four). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b). Thus, we must consider only whether the trial court acted within its discretion in balancing the evidence in support of the third, fifth, and sixth factors.

The third factor requires a trial court to consider whether "maintenance of the claim or action in the courts of this state would work a substantial injustice to the moving party." *See id.* § 71.051(b)(3). In doing so, trial courts should consider "the location of relevant documents and evidence and whether a majority of witnesses may be reached by compulsory process in Texas.'" *In re Weatherford*, 2024 WL 1819829, at *3 (quoting *In re Mantle Oil & Gas*, 426 S.W.3d at 192).

Here, holding the trial in Texas meant that Team could not subpoena fact witnesses in Kansas, such as Henson's adult children, who could have spoken to Henson's relationships with them, and Westar employees, who could have testified about communications between the Jeffrey Energy Center and Team's Broken Arrow office. Team was also unable to subpoena Kansas state regulators about the general maintenance of coal-generated power plants in Kansas and the results of any investigation into the accident. And Team was left to rely almost exclusively on deposition testimony to defend itself, which placed it at an unnecessary disadvantage. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 511 (1947) ("Certainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their case on deposition, is to create a condition not satisfactory to court, jury or most litigants."); *In re Oceanografía, S.A. de C.V.*, 494 S.W.3d 728, 730 (Tex. 2016) (orig. proceeding) (defendants entitled to forum non conveniens dismissal where many witnesses could not be compelled to testify in

Texas court and even though witnesses were willing and available to testify by deposition, defendants asserted that they would still be substantially prejudiced in presenting case to jury); *In re Pirelli Tire, LLC*, 247 S.W.3d 670, 678 (Tex. 2007) (orig. proceeding) (granting forum non conveniens dismissal because key evidence and witnesses who could testify about damages, including witnesses most likely to be familiar with condition and maintenance of truck and tire, were located in Mexico); *see also In re ENSCO*, 311 S.W.3d at 925 (explaining it would be substantially unjust to party moving for dismissal for forum non conveniens if "great majority" of witnesses would not be amenable to compulsory process in Texas.). For these reasons, we conclude that the third forum non conveniens factor favors dismissal of Most's suit for forum non conveniens.

For the fifth factor, the trial court was required to decide whether "the balance of the private interests of the parties and the public interest of the state predominate in favor of the claim or action being brought in an alternate forum," including "consideration of the extent to which an injury or death resulted from acts or omissions that occurred in this state." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b)(5). The private interest factors to consider include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses; (3) the possibility of view of premises, if view would be appropriate to

the action; (4) enforceability of a judgment once obtained; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Quixtar*, 315 S.W.3d at 33.

Again, the immediate acts or omissions that caused Henson's death occurred in Kansas. By the time of trial, Most had nonsuited her claims against the Emerson entities and Siemens, leaving Team as the sole defendant. In trying her case, Most did not focus on any conduct by Team in Texas and did not call any Texas witnesses to testify. Most argued that Team was negligent because it failed to adequately train its employees at its training facility in Alvin, Texas. But the evidence showed that Team provided some training for its employees in locations outside Texas and some training was available online, so any failure to provide adequate training was not necessarily attributable to actions or omissions by Team in Texas. In short, the record contains no evidence about any specific acts or omissions in Texas that caused the accident. Further, as noted in our discussion of the private-interest considerations under the third factor, evidence relating to Westar's conduct, including its communications with Team's Broken Arrow office and its response to the steam release at the Jeffrey Energy Center, is located in Kansas, beyond the subpoena power of Texas courts.

Requiring parties to litigate a case in Texas when evidence and fact witnesses are beyond the reach of compulsory process is a waste of private and public

57

resources. *In re Gen. Elec. Co.*, 271 S.W.3d at 689. We also recognize that Kansas has a strong public interest in protecting the health and safety of its residents, particularly when its own public utilities are involved. *See In re Pirelli Tire*, 247 S.W.3d at 679. Kansas's public interest in the suit is further reinforced by our holding that Kansas law applies, at a minimum, to proportionate responsibility issues and to the amount of damages that Most can recover for her wrongful death claim. *See In re Weatherford*, 2024 WL 1819829, at *5. Given that the only connection Most's suit has to Texas is the fact that Team has its corporate offices in Texas, Texas does not have a strong public interest in Most's suit. *See In re XTO Energy*, 2018 WL 2246216, at *9. Thus, it would be unfair to burden the residents of Fort Bend County with a retrial. For these reasons, the fifth forum non conveniens factor also supports dismissal of Most's suit for forum non conveniens. *See In re ENSCO*, 311 S.W.3d at 926–27 (holding fifth factor supported forum non conveniens dismissal and rejecting plaintiff's reliance on purported management decisions and actions allegedly made in defendant's Texas offices because plaintiff failed to identify any specific corporate policy linked to her husband's death); *In re CVR Energy, Inc.*, No. 01-15-00715-CV, 2016 WL 1389013, at *5 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding) (mem. op.) (even considering that defendant's corporate office was in Texas, Kansas had stronger interest in adjudicating dispute arising out of refinery fire in Kansas).

As to the sixth factor, Most argues that because her claims have already been tried, Team cannot establish that "dismissal would not result in unreasonable duplication or proliferation of litigation." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b)(6). But we have already held that the trial court erred in applying Texas law to certain of Most's claims and that the evidence does not support the damages award Most received. These holdings would require the Court to reverse the trial court's judgment and remand Most's suit for an entirely new trial. *See Gregory*, 670 S.W.3d at 564 (plurality op.); *Swinnea*, 318 S.W.3d at 882. Because a new trial is required, "dismissal [of Most's suit] would not result in unreasonable duplication or proliferation of litigation," and the sixth forum non conveniens factor supports dismissal. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b)(6).

In sum, all factors relevant to the statutory forum non conveniens analysis favor Kansas as the proper forum for Most's suit. Thus, we conclude that the trial court was required to "stay or dismiss the claim or action." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(b); *see In re Gen. Elec. Co.*, 271 S.W.3d at 686. Because it did not, we hold that the trial court erred in refusing to dismiss Most's suit based on forum non conveniens.

We sustain the remaining portion of Team's first issue.[15]

---

[15] Due to our disposition, we need not address any remaining issues raised by Team in its briefing. *See* TEX. R. APP. P. 47.1.

59

## Conclusion

We vacate the judgment of the trial court and dismiss the case for forum non conveniens.

Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Countiss and Farris.